**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.

---

**Jane Roe,**

    Plaintiff

**v.**

**Catholic Health Initiatives Colorado,
A Colorado nonprofit corporation,
d/b/a Centura-Health-Penrose Hospital**

    Defendant.

---

**Complaint**

---

COMES NOW Plaintiff, Jane Roe, by and through her counsel, Cornish & Dell'Olio, and for her Complaint against the Defendant, Catholic Health Initiatives Colorado, alleges the following:

**Introduction**

1. This is an action brought pursuant to the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.*, for discrimination. Jane Roe is a pseudonym. A motion for leave to file this action anonymously is being filed with the Complaint. A verification of the Complaint disclosing Plaintiff's true name is also being filed under seal with the Complaint.

**Jurisdiction**

1

2. The Court has jurisdiction over the subject matter of this case pursuant to 28 U.S.C. § 1331, 42 U.S.C. § 12117(a), 42 U.S.C. § 2000e-5(f)(3) and, 42 U.S.C. § 2000e-5(g).

**Venue**

3. The unlawful employment actions described below were committed in the State of Colorado. Venue is proper in the United States District Court for the District of Colorado under 28 U.S.C. § 1391(b).

**Parties**

4. Jane Roe is a natural person residing in Colorado Springs, Colorado.

5. Ms. Roe was employed by Catholic Health Initiatives Colorado at Penrose Hospital in Colorado Springs on July 13, 2009 as the Supervisor of Operating Room Supply Chain.

6. Prior to Ms. Roe's employment with Catholic Health Initiatives Colorado at Penrose Hospital she had twenty years experience in Logistics, including eleven years active duty in the United States Air Force and five years of federal Civil Service experience working for the Department of the Army in positions of increasing responsibility from GS-9 through GS-12. She has held a "Secret" security clearance from the Department of Defense while working for the Department of the Army.

7. Since approximately 1996 Ms. Roe has suffered from a physical impairment, degenerative disc disease, in her neck and back. She has undergone two major surgeries on her spine, which have not been completely successful.

8. Since approximately 1996 Ms. Roe has suffered from severe, chronic pain as the result of her degenerative disc disease, which, when not treated, substantially limits her walking, standing, bending, thinking, concentrating and sleeping.

9. Ms. Roe was prescribed narcotics by her physicians to treat and relieve her severe, chronic pain.

10. Ms. Roe's consumption of narcotics as medically prescribed to control severe pain did not interfere with her ability to function cognitively or physically and in fact allowed her to function normally.

11. Ms. Roe has worked without issue/problems at a GS-12 level for the federal government as a Logistical Statistician while taking prescription narcotics to treat her chronic, severe pain.

12. Ms. Roe was at all times relevant to the Complaint an individual with a disability who could, with or without accommodation, perform the essential functions of her position at Centura-Health.

13. Catholic Health Initiatives Colorado is a Colorado nonprofit corporation doing business as Centura-Health.

14. Catholic Health Initiatives Colorado is an "employer" within the meaning of 42 U.S.C. § 12111(5).

### Administrative Filing

15. In conformance with 42 U.S.C. § 2000e-5 a charge of discrimination was filed by Jane Roe with the United States Equal Employment Opportunity Commission in Denver, Colorado on or about April 27, 2010. Ms. Roe received a Notice of Right to

Sue right to sue on August 18, 2011 from the United States Equal Employment Opportunity Commission.

### General Allegations

16. Ms. Roe was hired by Catholic Health Initiatives Colorado at Penrose Hospital to fill the position of Supervisor of Operating Room Supply Chain.

17. The job duties of the position of Supervisor of Operating Room Supply Chain included expense management, contract compliance, and utilization compliance.

18. The job duties of the position of Supervisor of Operating Room Supply Chain included responsibility for "improving financial outcomes" of the hospital by monitoring and controlling all aspects of receiving, inventory control, and distribution of supplies to the operating rooms as well as contract compliance by vendors.

19. Several months prior to the commencement of Ms. Roe's employment Centura-Health had adopted new procedures designed to control overstocking of supplies and to insure contract compliance by vendors.

20. The new procedures had not been effectively and fully implemented or enforced before Ms. Roe's employment began.

21. As Supervisor of Operating Room Supply Chain, Ms. Roe was required to implement and enforce the new procedures.

22. The new procedures were very unpopular with many Centura-Health employees whom Ms. Roe worked with such as Nurse-Coordinators.

23. Prior to the commencement of her employment with Centura-Health, Ms. Roe was required to take a drug test (hereafter referred to as "the first drug test"). The

presence of opiates in her first drug test sample was detected and "passed" by a Centura-Health physician, Mary Dickson, M.D., following investigation, because Ms. Roe had been prescribed hydrocodone by her physician, Dr. Jenks, for treatment of the chronic pain caused by her degenerative disc disease.

24. Dr. Dickson determined that the consumption of prescription medication by Ms. Roe as prescribed by Dr. Jenks would not interfere with Jane Roe's ability to perform the essential functions of her position.

25. Upon information and belief the results of the first drug test were maintained in a confidential manner by the medical facility within Penrose Hospital, which reviewed the drug test results.

26. Neither Dr. Dickson nor Dr. Jenks imposed any restrictions or limitations on Ms. Roe related to the consumption of prescription medication.

27. Almost immediately after beginning her new job, Ms. Roe experienced resistance from Centura-Health employees to her efforts to achieve compliance with Centura-Health procedures designed to control overstocking of supplies, insure contract compliance by vendors, prevent the hospital from being overcharged for neurologic and orthopedic implants, and to prevent the hospital from over charging patients for services.

28. Resistance to her efforts to achieve compliance took the form of coworkers refusing to provide her with information needed to audit invoices and ensure that patients were invoiced correctly. Coworkers would frequently refuse to speak to her and would frequently refuse to provide any verbal response to her direct questions

5

about invoices.  Ms. Roe was required to obtain assistance from supervisors to obtain information from coworkers.

29. Resistance to her efforts to achieve compliance also took the form of name calling by coworkers such as "Blond Bimbo" "Bitch" and direct personal challenges to her authority to require compliance such as stating to her you are "nothing but a snot" "what the f___ do you think you're doing?".

30. Initially Ms. Roe attempted to perform her job without reporting the behavior of coworkers to her manager, Larry Higgins.  However, she began reporting the actions of coworkers to Supply Chain Manager, Larry Higgins, in October, 2009 and reported their actions to Larry Higgins numerous times between October, 2009 and January, 2010.

31. Larry Higgins response to her reports was to take no action on her behalf and to state that "people don't respond well to change" and that she should "give it time."

32. Prior to beginning her job assignment as Supervisor of Operating Room Supply Chain, Ms. Roe had been warned by another supervisor that she would be supervising a very disgruntled employee, a Supply Chain Technician, Chris Mike.  In fact the colleague referred to Mr. Mike as a "nightmare."

33. Almost from the beginning of her employment, Mr. Mike failed to perform his job duties and was openly insubordinate to her.  In response to her reasonable direction he ranted at her, yelled at her, and lectured her.

34. Ms. Roe reported Mr. Mike's behavior to Larry Higgins. Mr. Higgins instructed Ms. Roe to begin the process of terminating Mr. Mike's employment by documenting his misconduct. At this time Mr. Higgins was working with a manager in the Centura-Health Human Resources office, Kenya Russell, to terminate Mr. Mike's employment pursuant to Centura-Health's progressive discipline policies.

35. By December, 2009 Mr. Mike and the managers in the Human Resources office knew that she was attempting to terminate his employment.

36. During the fall of 2009, in addition to the open hostility of coworkers and the insubordination of Mr. Mike, Ms. Roe was the target of a series of acts of personal harassment by unknown Centura-Health employees. For example, an employee blew his nose in a scrub cap and left it on her desk, personal items were stolen from her office, and personal items, including a leather bag containing her prescription medication, was disturbed.

37. Upon information and belief an unknown Centura-Health employee searched Ms. Roe's personal belongings, including the leather bag containing prescription medication which she kept in her office, and found her prescription medications. The employee reported to the Centura-Health Human Resources office that she was "taking drugs."

38. In spite of the foregoing, Ms. Roe performed the essential job duties of the position of Supervisor of Operating Room Supply Chain satisfactorily, without exception, between July 9, 2009 and January 25, 2010.

39. On January 25, 2010 Ms. Roe was ordered by Centura-Health's Human Resources office to take a second drug test (hereafter referred to as the second drug test). The order to take a second drug test was delivered to her by Larry Higgins who told her that someone had accused her of using drugs. She was told by Larry Higgins that she would be on leave until released to return to work.

40. Ms. Roe complied with the order and submitted to a second drug test.

41. The following day Kenya Russell called Ms. Roe at home and told her to report to Centura-Health's office of "Drug Free Workplace" for an evaluation with a drug counselor, Denise Kidd.

42. On January 28, 2010 Ms. Roe, in compliance with the order from Kenya Russell, reported to Denise Kidd, a drug counselor, who is a Centura-Health employee and works in the office of Centura-Health's "Drug Free Workplace."

43. Prior to meeting with Ms. Kidd, Ms. Roe was required to complete forms, which required disclosure of medical and psychological information, including a psychological profile form and a medical history form which contained questions such as: Have you ever suffered from diabetes?, heart disease?, cancer?. The forms required disclosure of highly private medical information and would disclose the existence of disabilities.

44. The meeting with Ms. Kidd was required by Centura-Health Human Resources office as a condition of Ms. Roe's future employment.

45. During the meeting with Ms. Kidd, Ms. Roe was required to answer questions, which required disclosure of medical and psychological information and other

highly private information. The questioning required disclosure of the existence of disabilities. Questions asked included:

Do you self medicate?

Have you shared needles?

Have you ever been "addicted" to drugs?

Are you sexually active? – with more than one person?

46. The questioning of Ms. Roe described above in paragraphs 43 and 45 was likely to disclose that she was an individual with a disability or the nature or severity of such disability.

47. Ms. Roe, recognizing that she was being accused of being a drug addict, gave Ms. Kidd her private medical record, which disclosed her prescription medication and proved that she had disclosed her prescription medication to Dr. Dickson following the first drug test.

48. Ms. Kidd also required that Ms. Roe sign forms authorizing release of her confidential medical information to Centura-Health managers.

49. Ms. Kidd did not disclose to Ms. Roe the results of the second drug test but informed Ms. Roe that her opinion as to whether Ms. Roe should be allowed to return to work would be communicated to the Centura-Health Human Resources manager.

50. On February 4, 2010 Ms. Roe was required to attend a meeting in the Centura-Health Human Resources office, which was attended by Janet Reedy,

Centura-Health Human Resources manager, Heidi Bowen, an occupational nurse and Larry Higgins, her manager.

51. At the February 4, 2010 meeting Ms. Roe observed that Janet Reedy had a copy of the document containing her private health information, which she had given to Denise Kidd.

52. At the February 4, 2010 meeting Ms. Roe's private health information, which she had disclosed to Denise Kidd, was openly discussed and further disclosed.

53. The fact that Ms. Roe was taking prescription medication and the type of medication being taken was openly discussed at this meeting.

54. Ms. Roe was told by Janet Reedy that employees had made allegations against her accusing her of suffering from mood swings, not remembering conversations, rudeness, failing to say hello to coworkers, crossing her arms, rolling her eyes, and failing to make eye contact.

55. Ms. Roe denied that she was aware of such conduct.

56. The behaviors described, if they occurred, could have resulted from many possible causes, such as fatigue, stress, boredom or frustration and are not behaviors specifically related to the use or abuse of drugs.

57. Ms. Roe explained to the managers that coworkers were openly hostile toward her because of her enforcement of procedures and that she had reported this hostility numerous times to her manager.

58. At the February 4, 2010 meeting Janet Reedy stated to Ms. Roe "You have no right to work here and be on this medication." She also stated that Dr. Dickson had "no right" to pass her on the first drug test.

59. Janet Reedy told Ms. Roe that she would have to stop taking her prescription medication if she wanted to work for Centura-Health.

60. Janet Reedy announced at the February 4, 2010 meeting that Ms. Roe would be required to undergo a "fit for duty" medical examination.

61. Ms. Roe participated in a "fit for duty" examination with Dr. Dickson on February 18, 2010. Dr. Dickson showed Ms. Roe a list of the behaviors she was accused of engaging in including suffering from mood swings, not remembering conversations, rudeness, failing say hello to coworkers, crossing her arms, rolling her eyes, and failing to make eye contact.

62. Dr. Dickson told Ms. Roe that she would have to stop taking her prescription medication if she wanted to maintain her employment with Centura-Health. Dr. Dickson gave no medical reason for requiring that Ms. Roe discontinue her prescription pain medication.

63. Upon information and belief the Centura-Health Human Resources office imposed the requirement on Dr. Dickson that she communicate to Ms. Roe the requirement that she discontinue her prescription medication.

64. Over the next three weeks Ms. Roe endured great pain and discomfort as she weaned herself from prescription narcotics, which she had taken under a doctor's orders for thirteen years.

65. On March 3, 2010 Ms. Roe was required to attend a second meeting in the offices of Centura-Health Human Resources attended by Larry Higgins and Kenya Russell.

66. During this March 3, 2010 meeting her possible return to work was discussed. Larry Higgins, who was aware that Ms. Roe was weaning herself off prescription medications, discussed his hesitancy to have Ms. Roe return to work. He repeatedly made comments such as "I don't know which Jane (pseudonym) I will be getting back, Jane the go getter on medications" or "Jane off medications." Larry Higgins stated that he had never talked to or worked with "an unmedicated Jane."

67. At this meeting Ms. Roe was asked by Mr. Higgins if she knew what she would be like off medications.

68. The questioning of Ms. Roe described above in paragraph 67 was likely to disclose that she was an individual with a disability or the nature or severity of such disability.

69. Ms. Roe asked Mr. Higgins whether he wanted her to resign. Mr. Higgins responded that he did not think she could come back.

70. During the March 3, 2010 meeting Kenya Russell asked Ms. Roe if she would sign a letter of resignation "right now."

71. Ms. Roe declined and said she would need to go home and think about her decision.

72. Mr. Higgins asked her if she wanted to retrieve personal items from her office. She indicated that she did because she would not be released to return to work until March 15, 2010.

73. When Ms. Roe met Mr. Higgins later in the day to retrieve her personal items she told him she did not have a letter of resignation for him. Mr. Higgins indicated that he would have to terminate her if she did not resign.

74. On March 5, 2010 Ms. Roe, through her counsel, sent a letter to Kenya Russell requesting accommodation for her disability, specifically, that she be allowed to take prescription medication and requesting that Centura-Health engage in an interactive process with her.

75. No response to the March 5, 2010 letter was ever received.

76. On March 5, 2010 Ms. Roe received a letter from Kenya Russell claiming that she had verbally resigned at the March 3, 2010 meeting.

77. On March 10, 2010 Ms. Roe sent a letter, via counsel, stating that she had not resigned her employment and requesting that Centura-Health begin the interactive process in order to accommodate her disability.

78. No response to the March 10, 2010 letter was ever received.

79. At all times Centura-Health knew or should have known that allegations made against Ms. Roe were not credible. Centura-Health knew that employees who complained about Ms. Roe were probably biased against her.

80. At all times Centura-Health knew or should have known that allegations made against Ms. Roe were so lacking in detail and so subjective that they were not credible evidence of drug abuse.

81. Denise Kidd, Heidi Bowen, Janet Reedy, Kenya Russell and Larry Higgins were not supervisors or managers who required knowledge of Ms. Roe's private medical information in order to be informed of necessary restrictions on the work duties of Ms. Roe. In fact, no restrictions were ever imposed on Ms. Roe which would have prevented her from performing the essential job duties of her position.

82. The private medical information of Ms. Roe that was disclosed to Denise Kidd, Heidi Bowen, Janet Reedy, Kenya Russell and Larry Higgins should have been maintained in a confidential manner.

83. The medical examinations and inquires described above were not job related and consistent with business necessity.

84. Upon information and belief the medical examinations and inquires described above were conducted based on personal prejudice of individuals employed in the Human Resources office of Centura-Health who are biased against individuals who are required, as the result of a disability, to take prescription pain medication.

85. The Human Resources office of Centura-Health has engaged in systematic and widespread violations of 42 U.S.C. § 12112(d)(4) by making medical inquiries of individuals who take prescription medication to control pain related to disabilities, which are not job related and consistent with business necessity.

86. The Human Resources office of Centura has engaged in systematic and widespread violations of 42 U.S.C. § 12112(d)(4) by failing to keep information obtained from medical inquiries and examinations confidential and disclosing such information to managers and other employees who do not require the information to comply with restrictions.

87. The Human Resources office of Centura-Health has engaged in systematic and widespread violations of 42 U.S.C. § 12112(d)(4) by prohibiting individuals with disabilities from taking prescription medications, which do not interfere with their ability to perform essential job duties.

88. The Human Resources office of Centura-Health has engaged in systematic and widespread violations of 42 U.S.C. § 12112(d)(4) by terminating the employment of individuals with disabilities because they take prescription medications, which do not interfere with their ability to perform essential job duties.

**First Cause of Action**
**(42 U.S.C. § 12112 –ADA Discrimination)**

89. Paragraphs 1-88 are incorporated herein by reference.

90. Plaintiff is a qualified individual with a disability within the meaning of 42 U.S.C. § 12111(8).

91. Defendant discriminated against Plaintiff on the basis of disability in regards to the terms, conditions and privileges of employment and discharged her from employment in violation of 42 U.S.C. § 12112(a) when it:

    a. required her to submit to medical examinations on January 25, 2011 and February 18, 2010;

  b. Made medical inquiries on January 28, 2010 and March 3, 2010 in violation of 42 U.S.C. § 12112(d)(4)(A);

  c. On or after January 28, 2010, on February 4, 2010 and March 3, 2010 and at other times unknown to the Plaintiff, Defendant disclosed information obtained from medical examinations or inquires to persons who were not authorized to receive such information in violation of 42 U.S.C. § 12112(d) and 29 C.F.R. § 1630.14(c)(1);

  d. Failed to make a reasonable accommodation to a known physical limitation of Plaintiff in violation of 42 U.S.C. § 12112(b)(5)(A);

  e. Utilized a standard or criteria for employment at Centura-Health, which had the effect of discrimination on the basis of disability in violation of 42 U.S.C. § 12112(b)(3)(A). Specifically, Centura-Health used a standard or criteria for employment that employees be "drug free" of certain prescription narcotics, which has the effect of discrimination on the basis of disability; and

  f. Terminated Plaintiff's employment on the basis of Plaintiff's disability.

92. Defendant intentionally engaged in the unlawful employment practices described above.

## Prayer for Relief

WHEREFORE, Plaintiff prays for the following relief:

a. That the Court grant permanent injunctive relief enjoining Defendant, its management personnel employees agents, successors and all persons in active concert with it from engaging in employment practices which

      discriminate against persons with disabilities based on their use of prescription medication;

b. Declare that the Defendant has discriminated against Plaintiff in violation of the Americans With Disabilities Act;

c. Order Defendant to pay Plaintiff her wages and benefits;

d. Order Defendant to pay Plaintiff front pay in lieu of reinstatement;

e. Order Defendant to pay Plaintiff nonpecuniary and compensatory damages, including damages for humiliation, emotional distress and consequential damages;

f. Order Defendant to pay Plaintiff pre- and post-judgment interest at the highest rate allowed by law;

g. Award Plaintiff punitive damages;

h. Award Plaintiff costs and reasonable attorneys fees; and

i. All other legal or equitable relief to which Plaintiff is entitled.

## Jury Demand

Plaintiff requests this matter be tried by a jury.

Respectfully submitted on this 19th day of August, 2011.

                CORNISH & DELL'OLIO

                /s/ Donna Dell'Olio
                Donna Dell'Olio, #10887
                Cornish & Dell'Olio
                431 N. Cascade Avenue, Ste. 1
                Colorado Springs, CO 80903
                (719) 475-1204

FAX (719) 475-1264
Email: ddellolio@cornishanddellolio.com
Attorneys for Plaintiff

Plaintiff's Address:
3690 Pronghorn Meadows Circle
Colorado Springs, CO 80922

18