IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Magistrate Judge Kathleen M. Tafoya**

Civil Action No. 11–cv–02179–WYD–KMT

JANE ROE,

      Plaintiff,

v.

CATHOLIC HEALTH INITIATIVES COLORADO, a Colorado nonprofit corporation, d/b/a
Centura-Health-Penrose Hospital,

      Defendant.

---

## ORDER

---

This matter is before the court on Plaintiff's Motion to Compel and for Sanctions
Pursuant to Fed. R. Civ. P. 37" [Doc. No. 62] ("Mot.") filed February 6, 2012.  Although the
motion touches on the ultimate propriety of defense counsel's attempt to create an attorney/client
privilege between himself and any and all witnesses in the case for the purpose of preventing
plaintiff's counsel from having fair access to fact witnesses, the only issue ripe for resolution at
this stage is whether "1) emails sent by Centura Health's HR Department or Kutak Rock to
potential witnesses soliciting consent to representation by Kutak Rock and 2) representation
agreements possibly entered into between Kutak Rock and witnesses are protected by the
attorney-client privilege."  (Mot. at 4.)  Defendant filed its "Response to Plaintiff's Motion to

Compel and for Sanctions Pursuant to Fed. R. Civ. P. 37 [Docket No. 62]" on March 8, 2012

[Doc. No. 69] ("Resp."), and Plaintiff filed her Reply on March 21, 2012 [Doc. No. 72].

   ***Issue***

   Catholic Health Initiatives Colorado's ("CHIC") Initial Disclosures, served on Plaintiff

on or about November 16, 2011, listed thirty-one individuals with knowledge about the facts

alleged in the pleadings, some of whom were current employees, some who were former

employees, and some who had never been employees.  (Resp. 1-2.)  "On November 23, 2011, an

email that was prepared by undersigned counsel in connection with this litigation regarding the

joint representation was forwarded to certain individuals by Cecilia Peat, a human resources

employee at CHIC."  (*Id.*)  In addition, the same email "was also sent directly by Kutak Rock to

at least one individual."  (*Id.* at 2.)  The emails were sent, apparently, for the purpose of trying to

establish an attorney-client relationship with the witnesses in the case, whether they were current

employees or not.  Defendant claims ". . . legal representation of these individuals in connection

with this action is appropriate to protect each client's legal rights by rendering legal advice

where necessary."  (Resp. at 4.)  What the parties call the "Representation Agreements" consist

of the email sent to the recipients by Peat or Kutak Rock and the email recipients' affirmative

responses, also transmitted via mail.  (Resp. at 12-13.)

   Defendant claims with respect to information contained in the emails

   the Representation Agreements contain confidential information that is protected
   by the attorney-client privilege. For example, the Representation Agreements
   contain information that may expose the client's motivation for the legal

2

representation. A client's motivation for procuring legal representation is subject to the attorney-client privilege.

(Resp. at 10) (citations omitted).

Plaintiff argues these Representation Agreements are not privileged and demands production of the same.

### Attorney-Client Privilege

The attorney-client privilege is "the oldest of the privileges for confidential communications known to the common law." *In re Qwest Comm'cns Int'l. Inc.*, 450 F.3d 1179, 1185 (10th Cir. 2006) (quoting *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981)). The attorney-client privilege protects from discovery communications made in confidence between the client and the attorney. *EEOC v. Outback Steakhouse of Florida*, 251 F.R.D. 603, 610 (D. Colo. 2008). "The lawyer-client privilege rests on the need for the advocate and counselor to know all that relates to the client's reasons for seeking representation if the professional mission is to be carried out." *Horton v. United States*, 204 F.R.D. 670, 672 (D. Colo. 2002) (quoting *In re Bieter Co.*, 16 F.3d 929, 937-38 (8th Cir. 1994)). In order to be covered by the attorney-client privilege, a communication between a lawyer and client must relate to legal advice or strategy sought by the client. *United States v. Johnston*, 146 F.3d 785, 794 (10th Cir. 1998) (emphasis added); *In the Matter of Grand Jury Subpoena*, 697 F.2d 277, 278 (10th Cir. 1983). This privilege applies to corporations as well as individuals. *Upjohn*, 449 U.S. at 390. As the Supreme Court has recognized, "[t]he administration of the attorney-client privilege in the case of corporations, however, presents special problems. As an inanimate entity, a corporation must

3

act through agents." *Commodity Futures Trading Comm'n. v. Weintraub*, 471 U.S. 343, 348

(1985).

The purpose of the attorney-client privilege "is to encourage full and frank

communication between attorneys and their clients and thereby promote broader public interests

in the observance of law and administration of justice." *Upjohn*, 449 U.S. at 389. The party

seeking to invoke the attorney-client privilege bears the burden of establishing its applicability

and the lack of waiver of any privilege. *In re Foster*, 188 F.3d 1259, 1264 (10th Cir. 1999). *See

also United States v. Phelan*, 3 F. App'x 716, 718 (10th Cir. 2001).

In federal court, the law controlling determination of privilege issues depends upon the

dictates of Rule 501 of the Federal Rules of Evidence. Rule 501 states

> Except as otherwise required by the Constitution of the United States or provided
> by Act of Congress or in rules prescribed by the Supreme Court pursuant to
> statutory authority, the privilege of a witness, person, government, State, or
> political subdivision thereof shall be governed by the principles of the common
> law as they may be interpreted by the courts of the United States in the light of
> reason and experience. However, in civil actions and proceedings, with respect to
> an element of a claim or defense as to which State law supplies the rule of
> decision, the privilege of a witness, person, government, State, or political
> subdivision thereof shall be determined in accordance with State law.

*Id.* Jurisdiction in this case is premised upon alleged discrimination under the Americans with

Disabilities Act, 42 U.S.C. § 12101. (Compl. [Doc.No. 1] at 1.) Plaintiff asserts this court also

has jurisdiction over this case pursuant to 28 U.S.C. §§ 1331 and 42 U.S.C. § 12117(a), 42

U.S.C. § 2000e-5(f)(3) and, 42 U.S.C. § 2000e-5(g). (*Id.* at 2.) Therefore, federal common law

with respect to privilege governs this conflict.

Under federal common law, the attorney-client privilege arises (1) where legal advice of any kind is sought; (2) from a professional legal advisor in his capacity as such; (3) the communications relating to that purpose; (4) made in confidence; (5) by the client; (6) are at his instance permanently protected; (7) from disclosure by himself or by the legal advisor; (8) unless the protection is waived. *See Williams v. Sprint/United Mgmt. Co.*, No. 03-2200-JWL-DJW, 2006 WL 266599, at *2 (D. Kan. Feb. 1, 2006).

"[F]ederal courts narrowly construe all privileges, whether of constitutional, common-law, or statutory origin." *Everitt v. Brezzel*, 750 F. Supp. 1063, 1066 (D. Colo. 1990). "Whatever their origins, these exceptions to the demand for every man's evidence are not lightly created nor expansively construed, for they are in derogation of the search for truth." *United States v. Nixon*, 418 U.S. 683, 710 (1974) (unanimous decision).

### *Confidential Communication*

Generally, information on an attorney's billing statement which shows the fee amount, the general nature of the services performed, and the case on which the services were performed is not privileged. *United States v. Hodgson*, 492 F.2d 1175, 1177 (10th Cir. 1974) (matters relating to receipt of fees from a client are not usually privileged); *Clarke v. American Commerce Nat'l Bank*, 974 F.2d 127, 129–30 (9th Cir.1992). However, billing statement entries which reflect the client's motive in seeking representation, litigation strategy, or the specific nature of services provided, such as researching particular areas of the law, are privileged. *In re Gibco, Inc.,* 185 F.R.D. 296, 299 (D. Colo. 1997). The Tenth Circuit has recognized that

disclosing actual fee contracts has the potential for revealing confidential information along with

unprotected fee information.  *In re Grand Jury Subpoenas*, 906 F.2d 1485, 1492 (10th Cir.1990).

Defendant argues that the "Representation Agreements" at issue, consisting of an email

to a potential witness in the case imploring the witness to agree to legal representation supplied

by Kutak Rock and paid for by CHIC and the witness's agreement to the offered representation

on a return email, "are not just 'fee arrangements' but have additional information as well,

including but not limited to information that reflects on the client's motivation for procuring

legal representation and the specific nature of the legal services provided."  (Resp. at 6.)  In this

case it is interesting to note, however, that the client whose confidences might be contained in

the email sent from CHIC's Human Resources Department to various employee and non-

employee witnesses, is a confidence between the attorney and CHIC – not between the attorney

and the potential witness/client.

Given the court's finding, *supra*, that any attorney-client privilege which may have

existed with respect to the unsolicited email sent from CHIC or its lawyer to the various

witnesses in the case has been waived, however, it is not necessary for the court to undertake the

requisite *in camera* review to determine whether the "Representation Agreements" in this case

meet the criteria of confidential communications.

### *Waiver*

Generally, disclosing attorney-client communications to a third-party results in a waiver

of the attorney-client privilege.  *See In re: M & L Bus. Mach. Co., Inc.*, 161 B.R. 689, 693 (D.

Colo. 1993) ("the attorney-client privilege is lost if the substance of the confidential

communication is disclosed to a third-party, even inadvertently."); *Sedillos v. Bd. of Educ. of Sch. Dist. No. 1*, 313 F. Supp. 2d 1091, 1093 (D. Colo. 2004) ("the attorney-client privilege can be waived by [a]ny voluntary disclosure by the client of an otherwise privileged confidential communication").  Because confidentiality is key to the privilege, "[t]he attorney-client privilege is lost if the client discloses the substance of an otherwise privileged communication to a third party."  *United States v. Ryans*, 903 F.2d 731, 741 n.13 (10th Cir. 1990) (citing *United States v. Bump*, 605 F.2d 548 (10th Cir. 1979).  The Tenth Circuit continued,

> the confidentiality of communications covered by the privilege must be jealously guarded by the holder of the privilege lest it be waived.  The courts will grant no greater protection to those who assert the privilege than their own precautions warrant.

*Id.* (quotation and alteration omitted).  *See also United States v. Bernard*, 877 F.2d 1463, 1465 (10th Cir.1989) ("Any voluntary disclosure by the client is inconsistent with the attorney-client relationship and waives the privilege.");*Westinghouse Elec. Corp. v. Republic of Philippines*, 951 F.2d 1414, 1424 (3d Cir. 1991).  Once a client has revealed privileged information to a third-party, the basic justification for the privilege no longer applies.  *See* Comment, *Stuffing the Rabbit Back into the Hat: Limited Waiver of the Attorney-Client Privilege in an Administrative Agency Investigation*, 130 U. Pa. L. Rev. 1198, 1207 (1982).  Consequently, it is well-settled that when a client voluntarily discloses privileged communications to a third-party, the privilege is waived.

The Tenth Circuit has also held that "[c]ourts need not allow the claim of attorney-client privilege when the party claiming the privilege is attempting to utilize the privilege in a manner that is not consistent with the privilege." *Id.*; *In re Qwest Commc'ns Int'l Inc.,* 450 F.3d at 1185.

### A.      *CHIC/Kutak Rock's Disclosure to Peat*

The attorney-client privilege can extend to communications between representatives of the client or between the client and a representative of the client, if the communication was made in confidence for the primary purpose of obtaining legal advice. *Austin v. Denver ex rel. Bd. of Water Comm'rs,* 05-cv-01313-PSF-CBS, 2006 WL 1409543, at *4–5 (D. Colo. May 19, 2006); *Williams,* 2006 WL 266599, at *3. Therefore, the court accepts that confidential communications between the attorneys retained by the company and the Human Resources Department personnel do not necessarily lose their protected character so long as the confidential information is revealed for the purpose of obtaining legal advice. The "*sine qua non* for invocation of the privilege is that the communications in question were intended to be confidential." *Gottlieb v. Wiles,* 143 F.R.D. 241, 249 (D. Colo. 1992) (citing *United States v. Rockwell Intern.*, 897 F.2d 1255, 1265 (3d Cir. 1990)); *Bethel v. U.S. ex rel Veterans Admin. Med. Ctr.*, 55-cv-01336-PSF-KLM, 2008 WL 45382, at *7–8 (D. Colo. Jan. 2, 2008). Further, the presence of a third-party will not destroy the attorney-client privilege if the third-party is the attorney's or client's agent or possesses commonality of interest with the client. *See, e.g., Weatherford v. Bursey,* 429 U.S. 545, 554 (1977) (finding that attorney-client communications in the presence of a third-party not the agent of either are generally not protected by privilege); *Bethel,* 2008 WL 45382, at *7–8. Again, the court will accept that representatives of the client

8

company, CHIC, who work in the Human Resources Department could have the requisite commonality of interest under certain circumstances such as to salvage the protective status of communications.

Further, courts applying the rationale of the *Upjohn* and *Bieter* cases to third-party communications with an attorney have held that confidential communications between a party's counsel and a non-testifying expert or consultant, hired in anticipation of litigation, are protected by the attorney-client privilege. *See Western Res. v. Union Pacific R.R. Co.*, Case No. 00-20430CM, 2002 WL 181494, at *7 (D. Kan. Jan. 31, 2002); *Fru-Con Const. Corp. v. Sacramento Mun. Utility Dist.*, S-05-0583 LKK GGH, 2006 WL 2255538 (E.D. Cal. Aug. 7, 2006); *In re Grand Jury Subpoena Dated March 9, 2001,* 179 F. Supp. 2d 270, 283 (S.D.N.Y. 2001). The penultimate question is whether the third-party communication was made in confidence for the purpose of obtaining legal advice from the lawyer. *Compare Carter v. Cornell University*, 173 F.R.D. 92, 94-95 (S.D.N.Y.1997) (holding that the attorney-client privilege extended to interviews with university employees conducted at the request of counsel and for the exclusive use of counsel in providing legal representation) and *United States Postal Serv. v. Phelps Dodge Refining Corp.*, 852 F. Supp. 156, 161 (E.D.N.Y. 1994) (outside consultants hired by defendants to conduct environmental studies were not encompassed by the attorney-client privilege where their function was not to put information gained from defendants into usable form for their attorneys to render legal advice, but rather, to collect information not obtainable directly from defendants).

**B.**     ***CHIC/Kutak Rock's Disclosure for Joint Defense or Common Interest***

The "joint defense" or "common interest" doctrine is really an exception to the rule that the attorney-client privilege is waived when the communication at issue was made in the presence of a third-party. *In Re Qwest Commc'ns Int'l Inc.*, 450 F.3d at 1195. This kind of disclosure, however, is designed to protect communications between co-defendants or co-litigants, not a company attempting to chill its employee witnesses from communicating with its adversary's lawyer. *Westinghouse,* 951 F.2d at 1424 (the client may disclose communications to co-defendants or co-litigants without waiving the privilege). *See also Grand Jury Proceedings v. United States*, 156 F.3d 1038, 1042-43 (10th Cir.1998) (stating that establishing joint-defense privilege requires showing "(1) the documents were made in the course of a joint-defense effort; and (2) the documents were designed to further that effort").

Both CHIC and Kutak Rock willingly and knowingly revealed information in the emails they sent out which "may expose **[CHIC's]** motivation for the legal representation" to non-party potential witnesses. It is not disputed that the recipients of the emails were not and are not parties to this case and the emails were completely unsolicited by the recipients. (Resp. at 4.) As the individuals solicited by Kutak Rock on its own and in conjunction with its client, CHIC, are not, and in most cases cannot be, defendants in this matter there is no "joint representation" which could be had in this case. The email recipients had no liability under the facts of this ADA matter and therefore were not in need of "representation" in that sense.[1]

---

[1]Defendant has provided no authority to impose individual liability on any witness under the ADA.

The defendant argues that "legal representation of these individuals in connection with this action is appropriate to protect *each client's legal rights* by rendering legal advice where necessary." (Resp. at 4) (emphasis added). This statement is patently false. The "legal rights" – apparently thought by counsel to include the right to chill a witness's free ability to speak with opposing counsel – which defendant sought to protect are those of CHIC, not any of the email recipients.

### C.      CHIC/Kutak Rock's Disclosure to Potential Clients

The defendant cites to several cases for its proposition that information obtained in the course of initially acquiring a client later becomes protected by the privilege when the relationship of attorney and client is established. However, Defendant's cases all deal with information provided to the attorney by the 'would be' client who then later actually does retain the attorney to represent him in the matter. In this case, the client who holds the confidential information contained in the unsolicited email is CHIC, not the potential client/witness. That potential client/witness has communicated nothing. In sending the email, CHIC was obviously making a purposeful decision to reveal its otherwise confidential communications to unrepresented third-parties in hopes that the third-parties would allow the company lawyer to represent them, too, for CHIC's obvious strategic reasons.

In *United States v. Kovel*, 296 F.2d 918 (2d Cir.1961), the Second Circuit extended the attorney-client privilege to communications between a client and an accountant who had been hired to assist the attorney in representing that client. *Id.* at 922. *Kovel* recognized a privilege derivative of the attorney-client privilege between the accountant who was facilitating

11

communication between the attorney and the potential client in confidence "for the purpose of obtaining legal advice" from the attorney. *Id.* The privilege, extended to include the accountant, was between the attorney and the potential client and had nothing to do with the attorney revealing the confidences of a different client <u>to</u> the potential new client.

In *Gucci America., Inc. v. Guess?, Inc*., 271 F.R.D. 58, 70-71 (S.D.N.Y. 2010), the third person allowed entry into the attorney-client privilege realm to 'assist' with the attorney-client relationship was Plaintiff's in-house Intellectual Property Counsel acting at the direction of, and reporting to, its General Counsel. The primary issue in that case revolved around the international relationship between and among the parties and their attorneys. "The standard is whether the third-party agent is supervised directly by an attorney and whether the communications were intended to remain confidential." *Id.* at 72. Again, the privilege in that case was between the potential client and the attorney (including one or more third-parties), <u>not</u> between the attorney and a different client whose communications were being revealed.

*Matter of Bevill, Bresler & Schulman Asset Management Corp.,* 805 F.2d 120, 124 (3d Cir. 1986) addressed the relationship between a corporation's waiver of its privilege with an attorney and the individual directors' assertion of a claim of personal attorney-client privilege with respect to that same counsel consulted on both a personal and corporate basis. The case had nothing to do with whether or not a corporation waived its privilege by revealing confidential communications to persons who were not, at the time the disclosure was made, clients of the same attorney.

*Underwriters Ins. Co. v. Atlanta Gas Light Co.*, 248 F.R.D. 663, 670 (N. D. Ga. 2008), while dealing with Georgia state law, held, "[i]t is comparable to an initial discussion between an attorney and a potential client who intends to retain the attorney.  Georgia's privilege covers communications made pending [an attorney's] employment or in anticipation thereof."  *Id.* Again, the privilege concerns the confidences made by a potential client to an attorney in the course and scope of trying to retain the attorney's representation.

*Apex Mun. Fund v. N-Group Securities,* 841 F.Supp. 1423, 1426 (S.D. Tex. 1993), involved applicability of the attorney-client privilege to underlying confidential communications made in the course of hiring the lawyer and relied on in the creation of public offering statements when the statements were made ten days before the attorney was actually retained.

What counsel for defendant seems to ignore in his supporting case law is that the facts of this case demonstrate the initial emails, sent unsolicited by both the attorney and CHIC – the actual holder of any privilege – to various witnesses, contain only information which, at best, was confidential as between CHIC and Kutak Rock, *not the email recipients*, a/k/a the potential new clients.  The issue is whether CHIC has jealously guarded its own confidential material or whether CHIC voluntarily disclosed the material in an attempt to persuade witnesses to agree to representation by CHIC's lawyers.

The court finds that CHIC has voluntarily and explicitly waived the attorney-client privilege with respect to the contents of the emails and responses to emails which together make up the Representation Agreements at issue herein.

***Work Product Privilege***

Work product immunity derives from the provisions of Fed. R. Civ. P. 26(b)(3), which provides in relevant part:

> (3) Trial Preparation: Materials
>> (A) Documents and Tangible Things. Ordinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent). But ... those materials may be discovered if:
>>> (I) they are otherwise discoverable under Rule 26(b)(1); and
>>> (ii) the party shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their equivalent by other means.

*See American Banker's Ins. Co. of Fla. v. Colo. Flying Academy, Inc.*, 97 F.R.D. 515, 516 n.1 (D. Colo. 1983)(noting that Rule 26(b)(3) codifies the work product doctrine recognized in *Hickman v. Taylor*, 329 U.S. 495 (1947)).  *See McCall v. Skyland Grain, LLC,* Case No. 08-cv-01128-PAB-BNB, 2009 WL 1203304, *6–8 (D. Colo. April 29, 2009).  The work product privilege is governed by a uniform federal standard.  *Frontier Refining Inc. v. Gorman-Rupp Company, Inc.*, 136 F.3d 695, 702 n. 10 (10th Cir.1998)(internal quotation omitted).  As the court noted  in *Martin v. Monfort, Inc.*, 150 F.R.D. 172 (D. Colo.1993), when describing the process to be employed in deciding a claim of work product immunity:

> Rule 26(b)(3) . . . contemplates a sequential step approach to resolving work product issues. First, the party seeking discovery must show that the subject documents or tangible things are relevant to the subject matter involved in the pending litigation and are not privileged. Fed. R. Civ. P. 26(b)(1). Once such a showing has been made, the burden shifts to the party seeking protection to show that the requested materials were prepared in anticipation of litigation or for trial by or for the party or the party's attorney, consultant, surety, indemnitor, insurer or agent. Fed. R. Civ. P. 26(b)(3). Such a showing may be made by affidavit,

14

deposition testimony, answers to interrogatories, and the like. If the Court concludes that the items were prepared in anticipation of litigation, the burden shifts back to the requesting party to show: (a) a substantial need for the materials in the preparation of the party's case; and (b) the inability without undue hardship of obtaining the substantial equivalent of the materials by other means. Fed. R. Civ. P. 26(b)(3).

*Id.* at 172–73.

Defendant argues that the work product doctrine applies to the Representation Agreements, including the emails he originally authored and which were sent to the witnesses, because they were prepared in connection with litigation and because the documents may contain CHIC's motivation and legal services received. (Resp. at 17) (stating, "[h]ere, the Privileged E-Mail was prepared by the undersigned in connection with this litigation," *id.* at 13, and, "[i]n other words, they both contain the same protected information, including but not limited to information that reflects on the client's motivation for procuring legal representation and the specific nature of the legal services to be provided," *id.* at 17.) As noted *infra*, the court has found that the documents are not privileged because any such privilege has been waived by the clients' revelations to third-parties.

Although the plaintiff contests that the emails were prepared in anticipation of litigation, the court finds it unnecessary to quibble over this element. At the time the initial emails had been sent, the instant case had been filed against CHIC, initial disclosures had been made, and this was a contact made to each of the potential witnesses in the case. Although there is no real threat of litigation against the witnesses, there was pending litigation against the attorney-

15

author's client, CHIC.  Therefore, the court finds the transmissions were made in anticipation of litigation against CHIC.  Further, a strategy to control information flow from any person with knowledge of the facts of the case, however ill-conceived, is nevertheless likely to reveal the legal process of an attorney.

That said, however, Plaintiff has met her burden of necessity in order to obtain the Representation Agreements in discovery.  The email transmissions to the witnesses in the case apparently contain content which convinced the witnesses that they had something to fear from the Plaintiff and that they needed the services of a lawyer to "protect their legal rights" as opposed to the legal rights of the defendant CHIC.  (*See* Resp. at 4, stating as to the witnesses, "For some, there may even be a chance of being named as a party.")  As such the Representation Agreements are quintessential impeachment documents which would likely reveal bias, interest or motive for any witness's testimony.  The documents also might be used to show bad faith on the part of the defendant in attempting to muzzle witnesses and suppress the search for truth.  Further, the plaintiff states that she is planning to file a Motion to Allow Contact with Witnesses (Reply at 8) and that she needs the documents to demonstrate "that no actual representation exists." *Id.*  Even if the representation of some or all of the potential witnesses by Kutak Rock is determined to be appropriate, the information that CHIC has hired, retained and paid for the witnesses' representation by their own lawyer is itself impeachment material.  The documents were created and maintained by the defendant who is using the privilege to withhold release of the documents in discovery.  There is no other way for the plaintiff to obtain the documents.

It is therefore **ORDERED**

"Plaintiff's Motion to Compel and for Sanctions Pursuant to Fed. R. Civ. P. 37" [Doc. No. 62] is **GRANTED** in part.  Defendant shall produce to Plaintiff all documents responsive to Plaintiff's Request for Production No. 4, "produce all agreements entered into between Kutak Rock and witnesses (all individuals listed in Defendant's First Supplement to Defendant's Rule 26(a)(1) Disclosures) in the litigation which provide for legal representation of witnesses, including disclosures of conflicting interests" <u>and</u> documents responsive to Plaintiff's Request for Production No. 5, "produce all written communications (including emails) sent to employees of Defendant concerning Jane Roe or the present litigation," but only to the extent the request seeks emails sent to witnesses or other persons with knowledge and which form part of the so-called Representation Agreements.  Production of all responsive documents pursuant to this Order shall occur **on or before April 16, 2012.**

It is further **ORDERED**

In light of Colo. R. Civ. P. 4.2 and Ethics Committee of the Colorado Bar Association's Ethics Opinion No.120 dated May 17, 2008, Plaintiff's request for sanctions against the defendant pursuant to Fed. R. Civ. P. 37 with respect to documents ordered for production herein is **DENIED**.  The court will, however, consider the award of sanctions, if legally merited, upon a

17

successful Motion to Allow Contact with Witnesses.  *See McCargo v. Texas Roadhouse, Inc.*, Case No. 09-cv-02889-WYD-KMT, 2011 WL 97138 (D. Colo. Jan. 12, 2011.)

       Dated this 11th day of April, 2012.

                BY THE COURT:

                Kathleen M. Tafoya
                United States Magistrate Judge